## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **v.** | |
| **RODNEY WHITING** | **NO. 23-29-2** |

## MEMORANDUM OPINION

Defendant Rodney Whiting is charged with attempting, committing, aiding and abetting, and conspiring to commit robberies that interfere with interstate commerce, in violation of 18 U.S.C. §§ 1951(a) and 2, as well as using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). Whiting has moved to suppress evidence gathered after he was stopped, detained, and arrested by officers and detectives from the Philadelphia Police Department in connection with a robbery investigation. After a hearing, and for the reasons set forth below, Whiting's Motion will be denied.

### I.    FACTUAL BACKGROUND

Defendant Rodney Whiting was arrested for his suspected participation in a robbery of a Dollar General store at 6000 North Broad Street in Philadelphia. The facts of the robbery are as follows. Surveillance footage from the Dollar General store showed three men enter the store just before 8:00 p.m. on October 4, 2022—a night where it had been drizzling steadily for hours. Robber #1 (alleged by the Government to be former Codefendant DaJuan Dantzler) was a black male wearing a blue and white camouflage ski mask, green pants, black and white Nike sneakers, and armed with a firearm. Robber #2 (allegedly Codefendant Lance Ryan) was a tall black male wearing a long black coat and light blue pants with writing and designs down the pantlegs.

1

Robber #3 (allegedly Defendant Rodney Whiting) was a black male wearing a gray hooded Nike sweatshirt, blue pants, black sneakers with multi-colored accents, and red socks. Robber #1 approached the cash registers, pointed the gun at the cashier, and demanded money from the registers. Robber #2 then walked behind the counter and removed cash from two of the registers, while Robber #3 stood to the side and corralled two customers toward an employee-only area next to the registers to restrict their movements. Within one minute, Robber #2 stole approximately $1,600 from the two registers. The men then fled the store.

Unbeknownst to the robbers, the stolen cash had been divided into piles within the registers, with one of the piles concealing a hidden GPS tracking device. Upon its removal from the store, that device emitted a signal to a private security firm, which then contacted the Philadelphia Police Department ("PPD"). The Dollar General store is situated across the parking lot from the PPD's 35th District station, located at 5960 North Broad Street. Officers from the 35th District searched for the offenders in the surrounding area and monitored the location of the GPS tracker, while detectives immediately visited the Dollar General, interviewed the cashier, and reviewed surveillance video footage of the robbery. Detectives passed on physical descriptions of the three men to radio dispatchers, who communicated to officers in the field the following message: "[W]e have a male who's tall with a black winter coat, light blue ripped jeans. Second male is gonna be wearing a gray hoodie, blue pants. Third male has a black coat with a white and blue ski mask, green pants."

Police officers followed the GPS tracker to the area of 6500 Ogontz Avenue, approximately 0.8 miles away from the Dollar General, where they observed Dantzler walking alone with a backpack in the same location as the tracker. Officers stopped him; saw a pile of money and a handgun in his opened backpack; and then detained him while the cashier from the

Dollar General was transported to his location. He identified himself as "John Dantzler" and told officers that his home address was 6845 Ogontz Avenue.

Meanwhile, other officers—including Officer Brad Momme and his partner, Officer Tim Kirby—continued searching the area for the other suspects. They began their search on foot around the spot where Dantzler was detained, near the intersection of 65th Street and Ogontz Avenue. At around 8:17pm, they got into their cruiser and drove north on Ogontz Avenue. Within seconds, Momme observed Whiting running northward on Ogontz Avenue just north of the intersection with 66th Street—about a block away from where Dantzler was stopped by police. (Momme's body-worn camera began to record audio and video continuously starting at this point.) The officers got out of their car and instructed Whiting to stop, which he did. As Momme approached Whiting, he noted to the radio dispatcher that he had stopped a suspect, and that the man was wearing "all green." Momme's body-worn camera shows Whiting wearing a green sweatshirt, green sweatpants with a red stripe down the side, and black sneakers with multicolored accents. The time was approximately 8:18pm.

The officers immediately handcuffed Whiting and asked why he was running. In response, he acknowledged that he had been running, but asked, "what does me running have to do with anything?" He further explained to the officers that he was on his way home, and that he had been running to try and beat the storm; it had been raining on and off all day and was drizzling at the time the stop occurred. Momme noticed that Whiting was sweating but that his clothing was dry, even though it had been raining. The officers placed Whiting in the back of their police cruiser; while in the car, he gave the officers his name, date of birth, and later, his home address.

Whiting then sat in the back of the cruiser for about fifteen minutes. During that time,

Momme liaised with other officers who had responded to the scene, instructing them to search the area from which he had seen Whiting come running.  Kirby, for his part, remained in the cruiser with Whiting and ran his name through a police database using the car's computer terminal.  After fifteen minutes passed, at approximately 8:32pm, other police officers arrived on the scene with the Dollar General cashier.  The cashier viewed Whiting in the headlights of a police cruiser, and reported that she was unsure whether he was involved in the robbery or not. After Momme and Kirby returned Whiting to the back seat of their cruiser, Momme commented to Kirby that Whiting was "shaking" and appeared "scared."

About a minute later, at approximately 8:33pm, Sergeant Lewis arrived on scene and spoke with Momme.  Momme reported that the Dollar General cashier was unsure about whether Whiting was one of the robbers, and repeated his own observations that Whiting seemed suspicious because he was "shaking like a leaf" and was "running" when police encountered him.  Momme also expressed to Lewis that he planned to let Whiting go, but first wanted to "backtrack" through the area he observed Whiting running from to see if he could locate any clothes he may have discarded.  Momme was specifically looking for a black coat, since the description of the suspects that went out over the police radio previously identified one of the men as wearing a black coat and green pants, which description partially matched what Whiting was wearing when he was stopped (namely, green pants).  Whiting and Lewis proceeded to search a nearby street for about five minutes, looking in and around residents' driveways and trash bins, but found nothing.  At the conclusion of the search, Momme reiterated to Lewis his disbelief about Whiting's story: "He's running, and his hoodie is dry, and his face is covered in sweat . . . if he was out in this shit, he'd be soaked."  At this point—approximately 8:39pm, roughly twenty-one minutes since Whiting was stopped— Momme deactivated his body-worn

4

camera.

Momme testified that, following his failed search for discarded clothing, he spoke on the phone with Detective Joseph Napolitan and Detective Funk (first name unknown), who were back at the 35th District headquarters reviewing surveillance footage from the Dollar General. Momme and Napolitan both testified that they discussed the footwear worn by one of the suspects, who was seen on the surveillance footage wearing a pair of black Air Jordan sneakers with multicolored accents and red socks. Momme explained to the detectives that he had seen Whiting wearing the exact same shoes and socks. This information had not previously been broadcast over police radio.

Napolitan also testified that, by the time he and Momme spoke, he had reviewed Whiting's arrest record and learned that both Whiting and Dantzler had recently been stopped as suspects in a robbery of a 7-Eleven store. He also learned that Whiting and Dantzler, when stopped for their suspected involvement in the Dollar General robbery, provided police with the exact same home address. Based on this evidence, Napolitan instructed Momme to bring Whiting to the 35th District headquarters for interrogation.

Momme turned on his body-worn camera again at approximately 8:58pm. At this point, Momme approached Whiting—who was still sitting in the back of the cruiser—and informed him that he was being detained for further investigation: "Hey Rodney, listen man, just going to give you a head's up, dude, all right, you gotta hang out with us for a bit longer, detectives want to talk to you, okay?" Momme then seized Whiting's cellphone, closed the cruiser door, and told Kirby: "The complainant obviously is unsure, but the pants and sneakers fit—match—and also the story doesn't add up."

Whiting was transported to the 35th District where, beginning at 9:47p.m., he was

interviewed on video by Napolitan. By that time, Whiting had been detained for about an hour and thirty minutes. Whiting was advised that he was under investigation and not free to leave. Napolitan read Whiting his *Miranda* rights from a piece of paper, and Whiting stated that he understood his rights. Whiting went on to deny his involvement in the Dollar General. He denied knowing anybody named "John Dantzler"—the name Dantzler had given to police at the time of his arrest—and he also denied his involvement in the robbery of the 7-Eleven store for which both he and Dantzler were previously stopped as suspects. At the conclusion of the interview, Whiting was advised that he was under arrest for his involvement in the Dollar General robbery. Napolitan took photographs of the clothing Whiting was wearing—including his Air Jordan sneakers—and sent him off to be booked. Napolitan, however, did not remove Whiting's sneakers and register them as evidence.

On October 23, 2022, a state search warrant was executed at 6845 Ogontz Avenue, Dantzler and Whiting's shared residence. Officers recovered 25 rounds of 9mm ammunition and mail in Whiting's name from the second-floor bedroom in the front of the house.

## II. DISCUSSION

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. const. amend. IV. Although the Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands," *Arizona v. Evans*, 514 U.S. 1, 10 (1995), Supreme Court jurisprudence has "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009). The exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v.*

*United States*, 468 U.S. 796, 804 (1984).

"Generally, for a search or seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based upon probable cause." *United States v. Bey*, 911 F.3d 139, 144-45 (3d Cir. 2018). "Warrantless searches and seizures"—such as those that occurred here— "are presumptively unreasonable unless the Government satisfies its burden of establishing," by a preponderance of the evidence, "that each individual act constituting [the] search or seizure was reasonable." *Id.* at 145 (internal quotation omitted); *see also United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) ("[T]he burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable.").

Here, the parties do not dispute that Whiting's initial stop, continued detention, and formal arrest were made without a warrant. The burden, then, lies with the Government to establish that each of these seizures—the initial stop, the continued detention, and the arrest— were "reasonable" within the meaning of the Fourth Amendment. *Id.*

### A. Officer Momme and Detective Napolitan Testified Credibly

As an initial matter, it is worth noting that the testimonies of Officer Momme and Detective Napolitan, elicited by the Government at the hearing in this matter, are central to the Government's case. Because the district court serves as the factfinder with respect to a suppression motion, "the Court may accept or reject any part or all of a witness's testimony" based on its evaluation of the witness's credibility. *United States v. Ferrell*, 2009 WL 5126350, at *3 (E.D. Pa. Dec. 29, 2009). In assessing credibility, courts consider several factors, including:

> [T]he witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic.

*Ferrell*, 2009 WL 5126350, at *3-4 (citation omitted). "[A] witness [is] not to be judged more or less credible because the witness is a law enforcement officer." *United States v. Howard*, 787 F. Supp.2d 330, 332 (D.N.J. 2011) (internal quotation omitted).

Here, Momme and Napolitan testified credibly. Their demeanors on the witness stand did not suggest duplicity, and they were able to recall details of Whiting's detention and arrest reasonably well. Their testimonies were also supported by video evidence—body-worn camera footage in Momme's case, and a video recording of the interrogation in Napolitan's. The only pieces of testimony not supported by video testimony are Momme's testimony that Whiting was running when police first encountered him, and Momme and Napolitan's testimony that they spoke on the phone about the shoes and socks Whiting was wearing. Each of these, however, is separately supported by other evidence in the record: Whiting himself admitted that he was running when police stopped him, and after Momme informed Whiting that he was going to be brought back to the police station to speak with detectives, Momme indicated to Kirby that Whiting's shoes matched the shoes worn by one of the suspects—the very information he testified that he learned over the phone from the detectives.[1] For these reasons, Momme and

---

[1] At the hearing in this matter, counsel for Whiting asked the Court to reject Momme and Napolitan's testimony that they knew Whiting's footwear matched one of the suspects' because Napolitan did not seize Whiting's shoes when he was formally arrested at the 35th District police station—since, the argument goes, such an important piece of evidence would not have been allowed to leave the police station if the police had known about it. But this argument is undercut by the fact that Momme is heard, on body-worn camera, commenting that Whiting's shoes matched the suspect's, as well as the fact that Napolitan made a point of taking a close-up photograph of Whiting's shoes after the interrogation concluded.

Napolitan's testimonies will be fully credited. *Ferrell*, 2009 WL 5126350, at *3-4.

**B. Fourth Amendment Seizures**

Where, as here, an individual is detained by police without a warrant, the degree of justification the government must provide to establish that the detention was reasonable depends on the type of seizure that occurred. "[P]olice encounters with citizens fall into one of three broad categories . . . : (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *United States v. De Castro*, 905 F.3d 676, 678 (3d Cir. 2018) (quoting *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014)) (citation modified). The Third Circuit has explained that:

> [t]he first type of encounter does not implicate the Fourth Amendment. *United States v. Williams*, 413 F.3d 347, 352 (3d Cir. 2005) (stating that officers do not violate the Fourth Amendment "merely by approaching individuals on the street or in other public places"); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991). The second category (*i.e.*, brief seizures or *Terry* stops) requires a showing that the officer acted with reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (stating that an officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot") (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). And the third category (*i.e.*, full-scale arrests) is proper only when an officer has probable cause. *Beck v. Ohio*, 379 U.S. 89, 91 (1964) ("Whether [an] arrest was constitutionally valid depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it.").

*Brown*, 765 F.3d at 288.

### i. *Whiting's Initial Stop Did Not Violate the Fourth Amendment*

Momme and Kirby's initial stop of Whiting falls into the second of these categories—a "brief seizure[] or *Terry* stop"—and thus must have been justified by a "reasonable suspicion" to comply with the Fourth Amendment. *Id.* "[R]easonable suspicion unequivocally demands that the detaining officers must have a particularized and objective basis for suspecting the particular

person stopped for criminal activity," with "[t]he ultimate question" being "whether the record is sufficient to establish that police had a reasonable suspicion based on articulated facts that would justify the search or seizure of the individual in question." *Bey*, 911 F.3d at 145. The reasonable suspicion analysis "require[s] the Court to consider the totality of the circumstances," *United States v. Silveus*, 542 F.3d 993, 1000 (3d Cir. 2008), and courts "give considerable deference to police officers' determinations of reasonable suspicion," 765 F.3d at 290 (internal quotations omitted). Further, under the "collective knowledge doctrine," "the knowledge of one law enforcement officer" closely involved in the investigation "is imputed to the officer who actually conducted the" *Terry* stop. *United States v. Whitfield*, 634 F.3d 741, 745 (3d Cir. 2010).

Whiting argues that the police lacked a reasonable, articulable suspicion to stop and detain him on the street during their investigation of the Dollar General robbery. He points to the fact that the clothing he was wearing—a green sweatshirt and green sweatpants—did not match the radio descriptions of the two remaining suspects, one of whom was seen wearing a gray hoodie and blue pants and the other wearing a dark coat and ripped jeans. He also notes that, when he was stopped by the police, he did not run from them or offer other resistance, but instead remained calm and cooperative throughout the encounter. Further, when he was searched by police, they found no money or weapons on his person—*i.e.*, no evidence that he had just participated in an armed robbery. All these facts, he argues, indicate that Momme and Kirby had no reasonable, articulable suspicion that could justify the initial stop and detention.

Contrary to Whiting's argument, the totality of the evidence presented at the hearing in this matter indicates that police had a "particularized and objective basis for suspecting" that Whiting was involved in the Dollar General robbery, and for stopping and detaining him while they investigated that suspicion. *Bey*, 911 F.3d at 145. Momme and Kirby encountered Whiting

10

running northbound on the 6600 block of Ogontz Avenue, less than a mile from the Dollar General store. This location was also about a block away from where Dantzler was stopped, and Momme knew that Dantzler was found in possession of a firearm and the tracking device apparently taken from the scene of the crime. *See United States v. Robertson*, 305 F.3d 164, 168 (3d Cir. 2002) (finding reasonable suspicion where a police captain witnessed the defendant "sprinting through the streets of Philadelphia, in close proximity to the scene of the armed robbery"); *Bey*, 911 F.3d at 146 (finding that an individual being located "where police expected to find th[e] suspect" weighed in favor of reasonable suspicion to stop that individual).

Whiting was also wearing green pants, which matched the description of one of the suspects that was broadcast over police radio. *See id*. (finding that a person "wearing clothing similar to that worn by the fleeing suspect" weighed in favor of reasonable suspicion). Whiting argues that the suspect wearing green pants during the robbery was really Dantzler, and that since Dantzler had already been stopped, Momme and Kirby's reliance on the color of his pants was misplaced. But as Momme's testimony and body-worn camera footage indicated, he and Kirby did not know what Dantzler was wearing during the robbery or when he was stopped; in other words, they did not know "which suspect fit which description," but were instead searching for any suspect matching any of the three descriptions given over police radio.

As for Whiting's compliant attitude and the explanation he provided when he was stopped—that he was running to get home before the drizzling rain turned into a heavy storm—neither of these facts eliminate the reasonable suspicion that the police had to stop and detain him, because reasonable suspicion does not required officers to "'rule out the possibility of innocent conduct.'" *United States v. Henley*, 941 F.3d 646, 653 (3d Cir. 2019) (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). Besides, as Momme indicated to Kirby immediately

after they stopped Whiting, Momme disbelieved Whiting's story because his clothing was dry, despite the steady drizzle. *See United States v. Green*, 897 F.3d 173, 185 (3d Cir. 2018) ("Contradictory or inconsistent statements may contribute to reasonable suspicion . . . ." (citing *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003))). This suggested to Momme that Whiting had somewhere nearby changed into new, dry clothes, and caused him to initiate a search for discarded clothing in the alleyway from whence he saw Whiting running.

Considering the totality of these circumstances, Momme and Kirby had a "reasonable suspicion based on articulated facts that would justify" stopping Whiting and detaining him in their police cruiser while they investigated Whiting's involvement in the Dollar General robbery. *Bey*, 911 F.3d at 145. Accordingly, Whiting's initial stop and detention were reasonable, and therefore did not violate his Fourth Amendment rights.

### ii.    *Whiting's Continued Detention Did Not Violate the Fourth Amendment*

As described above, when the Dollar General cashier arrived at the location where Whiting was being detained and had a look at him in the light of the police cruiser, she was unsure whether he was one of the robbers or not. Whiting argues that this failed identification effectively eliminated whatever reasonable suspicion police may have had that he was involved in the robbery, and that his continued detention beyond that point violated his Fourth Amendment rights.

As the Supreme Court has emphasized, the purpose of a *Terry* stop is to "'investigat[e] possible criminal activity . . . .'" *United States v. Sharpe*, 470 U.S. 675, 685 (1985) (quoting *Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981)). For this reason, a legal *Terry* stop remains legal during the time in which "the police diligently pursue[] a means of investigation that [i]s likely to confirm or dispel their suspicions quickly . . . ." *Id.*; *see also Florida v. Royer*,

460 U.S. 491, 500 (1983) (explaining that a *Terry* stop must "last no longer than is necessary to effectuate the purpose of the stop"). However, a court assessing whether a *Terry* stop has run its constitutional course must "take care . . . not indulge in unrealistic second-guessing" of the efficiency of police activity; "[t]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Sharpe*, 470 U.S. at 687.

Here, the totality of circumstances suggest that it was reasonable for Momme and Kirby to continue detaining Whiting after the cashier failed to identify him as one of the robbers. As Momme noted to Sergeant Lewis after the failed identification, before letting Whiting go Momme wanted to "backtrack" through the alleyway he saw Whiting emerge from to search for clothing he may have discarded—specifically, the black jacket that the radio dispatcher reported was worn by the suspect in green pants. Momme and Lewis took five minutes to complete this search, and there is no evidence to suggest that they were dilatory in doing so. *See also United States v. Frost*, 999 F.2d 737, 742 (3d Cir. 1993) (finding that an eighty-minute *Terry* stop was reasonable where police exhibited "none of the indicia of a lack of diligence" in their investigation). Because the officers did not engage in "any delay unnecessary to the legitimate investigation" of the crime, *Sharpe*, 470 U.S. at 687, Whiting's continued detention during the five minutes Momme and Lewis searched the alley did not violate Whiting's Fourth Amendment rights.[2]

---

[2] The Court notes that approximately nineteen minutes passed between when Momme concluded his search of the alley (at around 8:39pm) and when he returned to his cruiser to drive Whiting to the police station at Napolitan's command (at around 8:58pm). Whiting does not argue that these nineteen minutes constituted an unreasonable extension of the *Terry* stop, but even if he had, that argument would fail for the same reason as his argument about the alleyway search did—because Momme spent those nineteen minutes talking on the phone to detectives and walking back to his police cruiser, that period was not a "delay unnecessary to the legitimate investigation" of the crime. *Sharpe*, 470 U.S. at 687.

### iii.    *Whiting's Arrest Did Not Violate the Fourth Amendment*

Finally, Whiting argues that police lacked probable cause to arrest and charge him with participating in the Dollar General robbery.  As explained previously, the question of "[w]hether [an] arrest was constitutionally valid depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it."  *Beck*, 379 U.S. at 91.  Since "the moment the arrest was made" is a crucial piece of the analysis, *id*., it must first be determined when, exactly, the arrest occurred.

Both parties recognize that Whiting was formally arrested following Napolitan's interrogation at the 35th District police station.  However, Whiting argues that a de facto arrest took place well before that.  Indeed, a *Terry* stop can develop into a de facto arrest in one of at least two ways: (1) when it lasts longer than necessary to carry out its "investigative" function, *Sharpe*, 470 U.S. at 685; or, (2) when it involves "involuntary transportation to a police station or other custodial setting" without exigent circumstances justifying as much, *United States v. Wrensford*, 866 F.3d 76, 85 (3d Cir. 2017).  As described previously, Whiting argues that the police lacked reasonable suspicion to continue detaining him after the Dollar General cashier failed to identify him; accordingly, Whiting places the time of arrest at the moment the failed identification occurred, roughly 8:32pm.  For reasons already laid out, this argument fails.  However, Whiting's detention did become a de facto arrest when he was involuntarily transported to the 35th District for interrogation because, according to Napolitan, he was not free to leave the station.  *See Hayes v. Florida*, 470 U.S. 811, 815-16 (1985) ("[P]olice procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the [Fourth Amendment]" when police "forcibly remove a person from his home or other place in which he is entitled to be

and transport him to the police station, where he is detained, although briefly, for investigative purposes.").

The question, then, is whether police had probable cause to arrest Whiting at the time Napolitan commanded Momme to bring Whiting to the station, which occurred sometime between 8:39pm (when Momme concluded his search of the alleyway) and 8:58pm (when Momme returned to the cruiser to drive Whiting to the police station). Probable cause has been defined in myriad ways, but "'[t]he substance of all the definitions is a reasonable ground for belief in guilt.'" *Carroll v. United States*, 267 U.S. 132, 161 (1925) (quoting *McCarthy v. De Armit*, 99 Pa. 63, 69 (Pa. 1881)). In the context of an arrest, probable cause exists when "the facts and circumstances within [the police's] knowledge and of which [the police] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Beck*, 379 U.S. at 91. This is "is not a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014), since it "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). Like the reasonable suspicion analysis, inquiries into probable cause "require the Court to consider the totality of the circumstances," *Silveus*, 542 F.3d at 1000, and to "weigh[] the inculpatory evidence against any exculpatory evidence available" to police at the time, *Wilson v. Russo*, 212 F.3d 781, 791 (3d Cir. 2000). Further, under the "collective knowledge doctrine," "the knowledge of one law enforcement officer" involved in the investigation "is imputed to the officer who actually conducted the" arrest. *Whitfield*, 634 F.3d at 745.

Here, Napolitan and Momme had probable cause to arrest Whiting when he was transported to the police station for investigation. At that time, Napolitan and Momme

collectively knew the following facts.  Three men were reported to have committed an armed robbery of the Dollar General store at 6000 North Broad Street.  Among the cash stolen from the store was a tracking device that emitted a real-time GPS signal indicating the tracker's location.  Police followed the tracker to the intersection of 65th Street and Ogontz Avenue—less than a mile from the store—where Dantzler was stopped in possession of cash stolen from the store, the tracking device, and a firearm.  Minutes later and roughly one block away, Whiting was seen running away from the area where Dantzler was stopped.  He was wearing green pants, which matched the radio description of one of the offenders, as well as a pair of black Air Jordan sneakers with multicolored accents and red socks, which exactly matched the footwear of one of the robbers seen on the surveillance video.  He did not have any cash, weapons, or other evidence from the scene of the crime on his person when he was stopped; however, he did report the exact same home address as Dantzler, and police learned that both men had previously been stopped a few months earlier as suspects in a robbery of a 7-Eleven store.  His clothing was also dry, despite the fact that it had been drizzling steadily all evening.  Finally, the cashier from the Dollar General positively identified Dantzler as one of the robbers, but was unsure if Whiting had been involved or not.

These circumstances contain both inculpatory and exculpatory facts.  In the first camp are the facts that Whiting was found near the scene of the crime and near Dantzler's location; that he was found running away from the direction of both of these places; that his clothing was dry, despite the rain; that his shoes and socks matched exactly the ones seen on the surveillance tapes as being worn by one of the robbers; that he and Dantzler were roommates; and, that they had both recently been stopped as suspects in a similar robbery.  Whiting argues that some of these facts and circumstances have innocent explanations—that he was running to avoid a storm, that

16

he was in the area because his home was nearby, and that he was innocent of the 7-Eleven robbery for which he and Dantzler were previously stopped as suspects. But as the Supreme Court has explained, potentially "innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens' demands." *Gates*, 462 U.S. at 243 n.13. In other words, "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* Here, the particular "noncriminal acts" at issue—running away from the area where one's roommate was stopped in possession of proceeds of a robbery, while wearing shoes and socks that match those worn by one of the suspects seen committing the robbery and clothing that is dry despite the rain—are sufficiently suspicious to warrant "a prudent man in believing" that Whiting was involved in the Dollar General robbery. *Beck*, 379 U.S. at 91; *Kaley*, 571 U.S. at 338 ("Probable cause, we have often told litigants, is not a high bar.").

Against these inculpatory facts must be weighed the exculpatory facts also available to Napolitan and Momme at the time—namely, that the Dollar General cashier did not positively identify Whiting as one of the robbers, and that Whiting was not found in possession of any proceeds of the robbery. But even taken together, these facts are not so "plainly exculpatory" as to eliminate the probable cause created by the inculpatory facts canvassed above. *See, e.g., Wilson*, 212 F.3d at 791-92 (finding probable cause after determining that inculpatory facts—(1) a positive identification by a victim witness and (2) testimony that the defendant was seen in the vicinity of the crime—were not overcome by exculpatory facts—(1) the defendant was four to seven inches shorter than the identifying witness originally estimated the assailant to be, (2) another victim failed to identify the defendant, and, (3) defendant's exact whereabouts at the

time of the crime were in dispute); *United States v. Tyree*, 292 F. App'x 207, 210 (3d Cir. 2008) (finding that police had probable cause to arrest when the defendant, who matched the physical description of a robbery suspect and had previously been suspected in other robberies, was found nearby the scene of the crime sitting in a car that matched the description of the getaway vehicle).

Considering these circumstances in their totality, the chances are low that Whiting—Dantzler's admitted roommate, alongside whom he had recently been stopped as a suspect in a similar crime—just happened to be running, wearing footwear exactly matching one of the robbers on surveillance video, one block away from where Dantzler was stopped in possession of proceeds of the Dollar General robbery. To the contrary, these facts suggest "a probability or substantial chance" that Whiting was involved in the robbery. *Gates*, 462 U.S. at 243 n.13. Napolitan and Momme therefore had probable cause to arrest Whiting at the time he was transported to the police station, so the arrest did not violate Whiting's Fourth Amendment rights.

An appropriate order follows.

BY THE COURT:

S/ WENDY BEETLESTONE

_____

WENDY BEETLESTONE, C.J.